UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| PAULINE WAGES | : | |
| | : | |
| v. | : | CIV. NO. 3:11CV1571 (HBF) |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER, SOCIAL SECURITY | : | |
| ADMINISTRATION | : | |
| | : | |

RECOMMENDED RULING ON CROSS MOTIONS

This action was filed under § 1631(c)(3) of the Social Security Act ("the Act"), 42 U.S.C. § 1383(c)(3), to review a final decision of the Commissioner of Social Security ("the Commissioner"), denying plaintiff's claim for Disability Insurance Benefits. Plaintiff Pauline Wages has moved to reverse the Commissioner's decision [Doc. # 18], while the Commissioner has moved to affirm. [Doc. # 24].

For the reasons that follow, plaintiff's Motion to Reverse **[Doc. # 18]** is **DENIED**. The Commissioner's Motion to Affirm **[Doc. # 24]** is **GRANTED**.

**I.      LEGAL STANDARD**

The scope of review of a social security disability determination involves two levels of inquiry. The court must first decide whether the Commissioner applied the correct legal

principles in making the determination.  Next, the court must decide whether the determination is supported by substantial evidence.  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971); Yancey v. Apfel, 145 F.3d 106, 110 (2d Cir. 1998).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  Gonzales v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977).  The court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993).  The court must scrutinize the entire record to determine the reasonableness of the Administrative Law Judge's ("ALJ") factual findings.  In reviewing an ALJ's decision, the court considers the entire administrative record. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The court's responsibility is to ensure that a claim has been fairly evaluated.  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983).

Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial

2

evidence standard to uphold the ALJ's decision "creates an unacceptable risk that a plaintiff will be deprived of the right to have her disability determination made according to correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1987)(citation and quotation marks omitted).  To enable a reviewing court to decide whether the determination is supported by substantial evidence, the ALJ must set forth the crucial factors in any determination with sufficient specificity. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  Thus, although the ALJ is free to accept or reject the testimony of any witness, a finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible review of the record.  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988).  Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding.  Peoples v. Shalala, No. 92 CV 4113, 1994 WL 621922, at *4 (N.D. Ill. 1994); see generally Ferraris, 728 F.2d at 587.

## II.  ADMINISTRATIVE PROCEEDINGS

Plaintiff Pauline Wages filed an application for DIB on September 18, 2009, alleging disability beginning March 26,

2009, due to back injury, asthma, thyroid problems, high blood
pressure, and arthritis. (Certified Transcript of the Record,
Compiled on December 14, 2011 (hereinafter "Tr.") 52, 138).  Her
claim was denied initially on November 25, 2009 (Tr. 71-74), and
on reconsideration on January 26, 2010. (Tr. 10, 79-81).
Plaintiff's date of last insured is December 31, 2013. (Tr. 52).
Plaintiff requested a hearing before an ALJ on March 25, 2010.
(Tr. 82-83).

On February 11, 2011, ALJ James E. Thomas held a hearing
where plaintiff appeared and testified. (Tr. 19-51).
Plaintiff's daughter Bethany Wages and vocational expert Dr.
Steven Sachs[1] also testified at the hearing. (Tr. 19-51).
Plaintiff was not represented by counsel. (Tr. 21).  On March
22, 2011, the ALJ issued an unfavorable decision. (Tr. 9-20).
On March 22, 2011, the Decision Review Board selected
plaintiff's claim for review (Tr. 7-9), and thereafter
transferred her case to the Appeals Council. (Tr. 4-6). On
September 20, 2011, the Appeals Counsel denied plaintiff's
request for review, thereby making the ALJ's decision the final
decision of the Commissioner.  (Tr. 1-3).  Plaintiff, now

---

[1] The hearing transcript reflects the vocational expert's name as
"Stephen Sacks".  However, Mr. Sach's resume reflects the correct
spelling as "Steven Sachs".  (Tr. 121).

4

represented by counsel, filed this timely action for review of the Commissioner's decision.

**III. PLAINTIFF'S APPEAL**

On appeal, plaintiff asserts the following arguments for reversal:

1. The ALJ erred at step three of the disability analysis.

2. The ALJ failed to give controlling weight to the treating source opinions.

3. The ALJ erred in failing to incorporate all limitations in plaintiff's Residual Functional Capacity.

4. The ALJ failed to properly assess the plaintiff's credibility.

5. The ALJ erred at step five of the disability analysis.

**IV. ALJ'S DECISION**

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. See 42 U.S.C. § 423(a)(1)(E). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Determining whether a plaintiff is disabled requires a five-step

5

process. See 20 C.F.R. § 404.1520. First, the ALJ must determine whether the plaintiff is currently working. See 20 C.F.R. § 404.1520(a)(4)(i). If the plaintiff is currently employed, the claim is denied. See 20 C.F.R. § 404.1520(b). If the plaintiff is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. § 404.1520(c). If the plaintiff is found to have a severe impairment, the third step is to compare the plaintiff's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137 (1987); Balsamo, 142 F.3d at 79-80. If the plaintiff's impairment meets or equals one of the impairments in the Listings, the plaintiff is automatically considered disabled. See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80. If the plaintiff's impairment does not meet or equal one of the listed impairments, at a fourth step, she will have to show that she cannot perform her former work. See 20 C.F.R. § 404.1520(e)-(f). If the plaintiff shows she cannot perform her former work, the burden shifts to the Commissioner to show that the plaintiff can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a plaintiff is entitled to

receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the plaintiff can perform alternate gainful employment. See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a plaintiff's Residual Functional Capacity ("RFC") by using the Medical-Vocational Guidelines set forth in the SSA Regulations ["the Grid"]. See 20 C.F.R. § 416.945(a) (defining "residual functional capacity" as the level of work a plaintiff is still able to do despite his or her physical or mental limitations). The Grid places plaintiffs with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled. A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered. See 20 C.F.R. Part 404, Subpart P, App. 2, 20 C.F.R. § 200.00(e)(1). If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the

7

testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the plaintiff could perform based on his residual functional capacity. See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

Following the five step evaluation process, ALJ Thomas concluded that plaintiff was not disabled as of March 26, 2009. (Tr. 18).  At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since March 26, 2009, the alleged onset date. (Tr. 13).  At step two, the ALJ found that plaintiff had severe impairments of degenerative disc disease and obesity.  (Tr. 13).

Although plaintiff asserted that a thyroid disorder, asthma and a cardiac condition were also disabling impairments, the ALJ found that a review of the objective medical evidence led him to conclude that these impairments did not cause any functional limitations, or that any such limitations were minimal at best. (Tr. 14).  The ALJ accordingly found that these impairments were nonsevere because "they do not significantly limit [plaintiff's] physical or mental ability to perform work-related activities." (Tr. 14).

At step three, the ALJ found that plaintiff's impairments,

either alone or in combination, did not meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 14). The ALJ found that plaintiff retained the RFC to perform sedentary[2] work, "except that she can sit or stand at will." (Tr. 14). The ALJ also found that plaintiff "can occasionally climb ramps and stairs, but she is precluded from climbing ladders, ropes and scaffolds. She can occasionally balance, stoop, kneel crouch and crawl." (Tr. 14).

In arriving at this conclusion, the ALJ considered the entire record and discussed the fact that although plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms", plaintiff's statements "concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with [] the residual functional capacity assessment." (Tr. 16). The ALJ also noted that the level of plaintiff's function, as testified to by plaintiff and her daughter, was not supported by the medical evidence, or the opinions of plaintiff's treating sources. (Tr. 16). The ALJ

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

stated that the "record reflected that [plaintiff] has not generally received the type of medical treatment one would expect for a totally disabled individual." (Tr. 16).   In reaching this conclusion, the ALJ also considered the opinions of plaintiff's physicians, Drs. Thomas J. Stevens and Jeffrey Bash. (Tr. 15-16).   The ALJ also considered the opinions of two State agency medical consultants, Drs. Abraham Bernstein and Firooz Golkar, who respectively assessed plaintiff's physical capacity at the initial and reconsideration levels.   (Tr. 16-17).   The ALJ did not adopt the opinions of Drs. Berstein and Golkar that plaintiff could perform work activity at the light exertional level. (Tr. 16-17).

At step four, the ALJ found that plaintiff was unable to perform any past relevant work. (Tr. 17). At step five, the ALJ considered plaintiff's age, education, and work experience in conjunction with the Medical Vocational Guidelines. (Tr. 17). The ALJ considered that at 45 years old, plaintiff was defined as a younger individual, with a high school education who was able to communicate in English. (Tr. 17). The ALJ concluded that jobs exist in significant numbers in the national economy that

plaintiff can perform, and therefore plaintiff was not disabled under the framework. (Tr. 17).[3]

**V.    SUBSTANTIAL EVIDENCE**

   ***A.    Hearing Testimony***

      ***1.    Plaintiff***

On February 11, 2011, plaintiff testified before ALJ Thomas at a hearing in Hartford. (Tr. 19). Plaintiff was not represented by counsel. (Tr. 20).  The ALJ canvassed plaintiff about proceeding pro se. (Tr. 21-26).  The record indicates that plaintiff was previously represented by an attorney on this matter (Tr. 22-23, 75-77, 124), but desired to go forward without representation. (Tr. 23, 25-26). Plaintiff executed a Waiver of Right to Representation dated February 11, 2011. (Tr. 128).

On the date of the hearing, plaintiff was forty seven (47) years old. (Tr. 28). Plaintiff testified that she completed high school and "almost two years" of college. (Tr. 28). Concerning her job history, plaintiff was a psychiatric technician at Hartford Hospital, Institute of Living. (Tr. 28, 33, 213). Plaintiff has not worked since March 26, 2009. (Tr. 31-33).

_____

[3] Plaintiff also filed a workers' compensation claim that was denied and in litigation as of September 28, 2009. (Tr. 138, 142-144).

Plaintiff testified that she injured her back while working as a psychiatric technician conducting a "take down" of an obese patient. (Tr. 28-29). Plaintiff also testified that prior to the onset of this injury she was experiencing "waves of pain" in her back. (Tr. 28). Plaintiff testified that she takes Vicodin and Synthroid.[4] (Tr. 38-39). Plaintiff also testified to experiencing heart palpitations that the Synthroid was supposed to control, but did not. (Tr. 38-39). Plaintiff is in pain all day, and experiences a burning sensation in her back. (Tr. 40). Plaintiff testified that she has arthritis, and that she gets depressed. (Tr. 32, 41).

Plaintiff testified that she is "unable to do many things […][she] would normally do." (Tr. 29). Plaintiff can no longer cook because she cannot stand at a stove. (Tr. 30). She is unable to take baths because she cannot sit in a bathtub, but is able to take showers. (Tr. 29-30). Plaintiff also testified that she must lie down on the bed and wash herself with towels. (Tr. 37). Plaintiff testified that she cannot drive; wash or braid her hair; or put her socks on, because these activities cause her pain (Tr. 31, 36-37).

---

[4] Synthroid is a synthetic replacement for a hormone that is normally produced by the thyroid gland. It is used to treat hypothyroidism or to prevent goiter. http://www.drugs.com/synthroid.html (last visited January 8, 2013).

12

With regard to exertional limitations, plaintiff stated she had to stand up during the hearing because the "chairs are so uncomfortable." (Tr. 21). Plaintiff testified she could stand for "maybe ten, fifteen minutes" at a time, and needs to stand to eat because sitting is painful. (Tr. 30). After standing for ten minutes, plaintiff obtains relief by lying down in bed. (Tr. 30). When plaintiff stands for a long period of time she feels like her "back is separating." (Tr. 37). Plaintiff testified that she cannot lift. (Tr. 35, 37). At the time of the hearing, plaintiff walked with a cane. (Tr. 32).

### 2. *Bethany Wages*

Plaintiff's daughter Bethany Wages also testified. (Tr. 42). At the time of the hearing, Ms. Wages was nineteen (19) years old. (Tr. 42). Ms. Wages testified that plaintiff "can hardly do anything for herself anymore", such as styling her hair, lifting her arms, cooking, taking a bath, and dressing herself. (Tr. 42). Ms. Wages helps her mother with these tasks. (Tr. 42). Ms. Wages testified that her mother cannot do the shopping or driving, and that lying down is "basically all [plaintiff] can do." (Tr. 42-43). Ms. Wages testified that prior to plaintiff's injury, plaintiff was able to complete various household chores. (Tr. 43-44). Ms. Wages testified that she,

13

her sister, and her father now help with these chores. (Tr. 44).

### 3. *Vocational Expert*

Dr. Steven Sachs testified as a vocational expert, without any objection by plaintiff. (Tr. 44).  Dr. Sachs testified that plaintiff's past relevant work qualified as a home companion and nurse assistant, which are classified between medium and heavy exertional levels. (Tr. 44-45). After going through various hypotheticals posed by the ALJ, Dr. Sachs concluded that the following jobs would be available to plaintiff at a sedentary exertional level: hand packer; production work; and production manager. (Tr. 45-47).

### B. *Medical Evidence*

Plaintiff alleges she is disabled on account of the following physical impairments: back injury, asthma, thyroid problems, high blood pressure, and arthritis. (Tr. 52). She alleges she is unable to function and work as of March 26, 2009. (Tr. 52).  A summary of the relevant medical evidence in the record follows.

### 1. Activities of Daily Living Questionnaire dated September 26, 2009 (Tr. 167-174)

Plaintiff's activities of daily living report revealed that plaintiff lives in a house with her family, that she mostly stays home, and lies in bed. (Tr. 167).  Since the onset of her

14

illnesses, plaintiff can no longer cook, clean, "have relations with her husband", go shopping, work, bend, and has a hard time with showering, exercising, stairs, doing the laundry, getting dressed, and sitting and standing for long periods of time. (Tr. 168).  Plaintiff also reports that her illnesses affect her sleep because she cannot get in a comfortable position. (Tr. 168). With respect to her personal care, plaintiff's illnesses affect her ability to dress, bathe, care for her hair, shave, feed herself, and use the toilet. (Tr. 168).  Plaintiff does not prepare her own meals, and relies on her family to cook for her. (Tr. 169).  Plaintiff states she does not cook because she cannot sit or stand for too long a period without experiencing pain in her back. (Tr. 169).  Plaintiff is unable to leave the house alone, or drive. (Tr. 170).

As of September 26, 2009, plaintiff took the following medications for her symptoms: methocarbomal[5], naproxen, Lyrica[6], cyclobenzaprine[7], and ibuprofen. (Tr. 169).  When plaintiff leaves the house, she wears a back brace that was prescribed to

---

[5] Methocarbomal is a muscle relaxant.
http://www.drugs.com/methocarbamol.html (last visited January 8, 2013).
[6] Lyrica is used, inter alia, to treat fibromyalgia and neuropathic pain associated with spinal cord injury.
http://www.drugs.com/lyrica.html (last visited January 8, 2013)
[7] Cyclobenzaprine is a muscle relaxant.
http://www.drugs.com/cyclobenzaprine.html (last visited January 8, 2013).

her by Dr. Stevens. (Tr. 173). Plaintiff believes that her
illnesses affect her ability to lift, squat, bend, stand, reach,
walk, sit, kneel, climb stairs, and complete tasks. (Tr. 172).
Plaintiff can walk a very short distance, or five (5) minutes,
before having to stop and rest. (Tr. 173).

### *2.* **Correspondence dated June 28, 2011, from Plaintiff to Appeals Council (Tr. 212-213)[8]**

On June 28, 2011, plaintiff wrote to the Appeals Council
about the review of her claims. (Tr. 212-13). In the letter,
plaintiff states that, she is "no longer capable of living the
life [she] once lived physically, emotionally, mentally, and
socially." (Tr. 212).  Plaintiff states in the letter that she
spends most of her time lying in bed to take pressure off her
back; standing is limited; sitting is extremely painful and
uncomfortable; that her physical appearance has been affected;
and that she is unable to complete household chores. (Tr. 212).
Plaintiff has "abnormally heavy periods because of her fibroid
issues". (Tr. 212).  Plaintiff also reports that she has worked
her entire life, up until her injury, and had an exemplary work
history with the Institute of Living. (Tr. 213).

---

[8] This letter post-dates the ALJ's March, 22, 2011 decision, but was
submitted to the Appeals Council.  Once the Appeals Council denied
review of the ALJ's decision, the letter became part of the
administrative record for judicial review.  Perez, 77 F.3d at 45.

### 3.    Physical Impairments

### a)    Back Injury/Arthritis

Plaintiff was seen at St. Francis Hospital and Medical Center in Hartford, Connecticut, on March 27, 2009 for complaints of lower back pain. (Tr. 214-216).  Plaintiff was transported to the hospital by ambulance. (Tr. 214).  Plaintiff reported lower lumbar pain that started two days prior, but then turned into "severe spasms". (Tr. 214). Plaintiff initially reported her pain as a 10 on a scale of 10, but her pain levels subsided after taking pain medication.  (Tr. 215).  Prior to being discharged home, plaintiff was "easily ambulating". (Tr. 215-216).

On March 30, 2009, plaintiff saw Dr. Mark Josel and reported severe pain in the lumbosacral area of her back. (Tr. 218).  Treatment notes reflect that an X-Ray revealed "mild degenerative changes in the lumbosacral spine." (Tr. 218).  The diagnostic report dated March 30, 2009 concludes, "[t]here is a mild scoliatic curvature of the spine" and "[t]here are mild degenerative changes primarily involving the facets at the lower lumber spine." (Tr. 229).  Plaintiff was injected with Depo-Medrol[9] and started a Medrol dos pak (sic)[10] for her pain.  A few

---

[9]  Depo-Medrol is a corticosteroid and works by modifying the body's immune response and decreasing inflammation.

days later, plaintiff was also prescribed Ultracet.[11]  (Tr. 218).
On April 13, 2009, Dr. Josel prescribed plaintiff tramadol. (Tr.
218), which plaintiff later reported provided her with little
relief. (Tr. 257).

On May 6, 2009, plaintiff was seen by Dr. Thomas J. Stevens
for an assessment of her lumbar spine. (Tr. 257-58). Dr.
Stevens' report indicates that plaintiff's "pain pretty much
stays in the area left of her sacroiliac joints, but it does
occasionally radiate down her left thigh." (Tr. 257).  Plaintiff
reported her pain as a 10 out of a scale of 10. (Tr. 257).
Plaintiff reported some localized tenderness in the midlines
between L5 and S1. (Tr. 258).  Straight leg raises performed in
the supine position produced some mild discomfort on plaintiff's
left side at ninety (90) degrees. (Tr. 258). Plaintiff had no
motor loss. (Tr. 258).  An x-ray of plaintiff's back on this
date indicated it was within normal limits, that there was no
evidence of spondylolisthesis, and the coccygeal area was within
normal limits. (Tr. 258).  Plaintiff received a lidocaine
injection in her lower lumbar spine, which did not take away all

_____

http://www.drugs.com/cdi/depo-medrol-suspension.html (last visited on
January 8, 2013).
[10] Medrol Dosepak is a steroid that prevents the release of substances
in the body that cause inflammation. http://www.drugs.com/mtm/medrol-
dosepak.html (last visited on January 8, 2013).
[11] Ultracet is a comination of tramadol, a narcotic-like pain reliever,
and acetaminophen.  http://www.drugs.com/ultracet.html (last visited

of the pain.  Dr. Stevens prescribed a short course of physical therapy. (Tr. 258).  Dr. Stevens indicated "[n]o work yet." (Tr. 258).  On May 18, 2009, plaintiff returned to Dr. Stevens' office, where she reported feeling better with a combination of Neurontin[12], Flexeril[13], and Motrin. (Tr. 256).  Plaintiff reported her pain as an 8 on a scale of 10. (Tr. 256).  At a follow up appointment on May 26, 2009, Dr. Stevens prescribed plaintiff Darvocet[14] for pain. (Tr. 255).  Dr. Stevens's impression of plaintiff included chronic mechanical back pain. (Tr. 255).  Dr. Stevens kept plaintiff out of work, but expressed hope she would return to work the following week. (Tr. 255).

On May 20, 2009, plaintiff again saw Dr. Josel for back pain. (Tr. 219).  The treatment notes indicate that she was referred to Dr. Stevens and received a Novocain injection in her back, but was still in distress. (Tr. 219). An MRI dated May 22, 2009 indicates, "At the L4-5 level, there is mild diffuse annular bulge with degenerative changes of the facet joints and

---

on January 8, 2013).
[12] Neurontin is a medication that affects chemicals and nerves in the body that cause some types of pain. http://www.drugs.com/neurontin.html (last visited on January 15, 2013).
[13] Flexeril is a muscle relaxant.  http://www.drugs.com/flexeril.html (last visited January 8, 2013).
[14] Darvocet is a narcotic pain reliever. http://www.drugs.com/darvocet.html (last visited on January 15, 2013).

borderline central stenosis." (Tr. 228).  On May 28, 2009, plaintiff reported some back pain, but stated it seemed to be somewhat improved. (Tr. 219).

In June 2009, plaintiff was again seen by Dr. Stevens for her back pain. (Tr. 252-54).  Plaintiff reported occasional left leg radicular pain. (Tr. 254). Dr. Stevens found plaintiff's exam unchanged and that she was uncomfortable sitting, standing, and lying. (Tr. 254).  Plaintiff was provided samples of Lyrica, and she reported feeling better with its use. (Tr. 252-54).  At this time, physical therapy was helping plaintiff a little bit. (Tr. 252). On June 26, 2009, Dr. Stevens assessed plaintiff with sciatica and noted, "For the time being I think [plaintiff] could return to work part time four hours a day with no lifting. […] I will give her a note to return for part-time work with no lifting four hours a day and no bending." (Tr. 252). Plaintiff was seen by Dr. Stevens and his associate in July 2009, where she reported that she felt better with chiropractic treatment. (Tr. 250-51).  At this time, plaintiff's doctors did not find that she was able to work. (Tr. 250-51). In July 2009, Anita Salerno, APRN, observed plaintiff as uncomfortable. (Tr. 239).

In August 2009, plaintiff continued to see Dr. Stevens for ongoing sciatica. (Tr. 249). Plaintiff reported feeling better,

but was still having difficulty. (Tr. 249).  Based upon plaintiff's then assessment, Dr. Stevens found her a good candidate for an epidural block. (Tr. 249).  In August 2009, plaintiff was referred by Dr. Stevens to Dr. Abner Gershon for a lumbar spine injection. (Tr. 245-46).  Plaintiff reported her pain as an 8 on a scale of 10. (Tr. 245). Plaintiff experienced pain in the left lower back with straight leg raises. (Tr. 245). Dr. Gershon assessed plaintiff with lumbar spondylosis with radicular left leg plain, and injected plaintiff with a lumbar transoraminal steroid. (Tr. 245).

Plaintiff continued to be seen by Dr. Stevens in September 2009 for ongoing back pain and sciatica. (Tr. 244, 247-48). Plaintiff reported a partial response to the injection administered by Dr. Gershon, but was still experiencing a moderate amount of pain. (Tr. 248). She also experienced hamstring spasms. (Tr. 244, 247-48). On September 2, 2009, Dr. Stevens prescribed plaintiff a lumbosacral corset. (Tr. 248). With the corset, Dr. Stevens believed plaintiff could be gainfully employed with the following restrictions: no excessive walking or bending, and no lifting more than 20 pounds. (Tr. 248).[15]  At one appointment with Dr. Stevens, plaintiff was

---

[15] With respect to a report prepared by Dr. Stevens stating she could lift up to twenty (20) pounds while wearing a lumbar corset, plaintiff

"[v]ery upset and crying out loud about her frustration with her back situation." (Tr. 247). Plaintiff reported the lumbrosacral corset was not helping her, and her epidural resulted in minimal success. (Tr. 247). On September 9, 2009, Dr. Stevens placed plaintiff on strict bed rest for one week, and noted "[n]o work yet." (Tr. 247). On September 25, 2009, Dr. Stevens's impression concluded, "[c]hronic low back pain, partially resolved. No work yet." (Tr. 244). Plaintiff testified that she no longer sees Dr. Stevens because he "is not able to give [her] the care that [she] need[s]." (Tr. 22).  In September 2009, plaintiff was also seen at Hartford Hospital's emergency room for exacerbation of back pain. (Tr. 234-35). Plaintiff appeared uncomfortable; her back was tender from the mid to lower lumber spine and over the left S1 joint, and straight legs and leg lifts caused plaintiff back pain. (Tr. 234).

Plaintiff saw Dr. Jeffrey A. Bash in April 2010. (Tr. 271-72).  Plaintiff reported feeling pain that "comes down into her hips and down into her legs", since lifting a paralyzed patient at work in March 2009. (Tr. 271).  Plaintiff reported her leg pain had subsided, but that she has pain in her low back and hips. (Tr. 271).  At this time she ambulated with a normal gait,

---

testified that Dr. Stevens "assumed" this and completed the form for unemployment purposes. (Tr. 35-36).

and did not present in acute distress. (Tr. 271). Straight leg raising was negative bilaterally. (Tr. 271). During the examination, plaintiff would "only bend 5 degrees forward and 2 degrees backwards for fear of pain." (Tr. 271). Dr. Bash did not note any significant spinal curvature during his exam of plaintiff. (Tr. 271). Dr. Bash's impression of plaintiff's condition was an annular tear, disc degeneration, and low back pain. (Tr. 271). Dr. Bash started plaintiff on aquatic-based physical therapy. (Tr. 272).

A MRI of plaintiff's lumbar spine taken on May 21, 2010 indicated: mild multilevel disc desiccation; mild left lateral/forminal annular bulging with no disc herniation at L3-4; broad-based disc bulge at L4-5, which effaces the right lateral recess and would have potential to impinge the right-sided descending L5 nerve root; and minimal facet hypertrophy with no disc herniation at L5-S1. (Tr. 261). Dr. Bash assessed plaintiff with a herniated disc, lumbar radicular syndrome, and facet syndrome and recommended plaintiff receive facet injections and physical therapy. (Tr. 270).

In July 2010, plaintiff reported improvement of her back pain after receiving facet injections, and also reported intermittent left leg pain. (Tr. 268). A physical exam of

plaintiff "reveal[ed] tenderness over the facets from L3 to S1. She has increased pain with extension and decreased with flexion.  Strength from L1 to S1 is 5/5." (Tr. 268).  (Tr. 268). Dr. Bash provided plaintiff with a lumbar support orthotic. (Tr. 268).

A letter dated August 31, 2010 from Dr. Bash to Attorney Timothy Mills states that plaintiff's then diagnosis was "facet syndrome lumbar spine, disc degeneration lumbar spine, lumbar strain, and disc bulge L4-5 with protrusion." (Tr. 263). Plaintiff's prognosis was then "fair to guarded." (Tr. 263). Dr. Bash also stated that plaintiff would not need surgical intervention for her condition; "I anticipate she will be at maximum medical improvement in approximately three to four months." (Tr. 263).

In September 2010, plaintiff developed recurrent facet pain. (Tr. 267). She reported that pain increased with physical activities, and decreased with rest. (Tr. 267). Straight leg raising was positive, and she presented a 5/5 grade strength in all groups. (Tr. 267). Dr. Bash assessed plaintiff with facet syndrome, disc degeneration, and lumbar radicular syndrome. (Tr. 267).  In October 2010, plaintiff still reported having some pain, and was tender over the facets from L4 to the sacrum. (Tr.

24

264). At this time, she also reported increased pain with extension and side bending. (Tr. 264). Plaintiff received spinal injections from Dr. Bash in September 2010, November 2010, and January 2011. (Tr. 259; 265-66).

In December 2010, Dr. Bash saw plaintiff, who complained of severe pain and inability to perform any prolonged activity. (Tr. 304). At this time, Dr. Bash's impression of plaintiff included: facet syndrome, disc degeneration, and radiculopathy. (Tr. 304). Plaintiff's strength from L1 to S1 was a 5/5. (Tr. 304). In January 2011, plaintiff complained of pain in her right buttock that radiated down her right leg, which increased with physical activity. (Tr. 303). At this time, plaintiff displayed tenderness over the right sciatic notch. (Tr. 303). Dr. Bash assessed plaintiff with a herniated disc, disc degeneration, and lumbar radicular syndrome. (Tr. 303). Dr. Bash recommended an epidural injection (Tr. 303), which was administered to plaintiff the following day. (Tr. 301-02). In February 2011, after receiving an epidural injection, plaintiff reported "the best three days of her life." (Tr. 300). Dr. Bash noted that plaintiff had reached maximum medical improvement and that "she has a permanent partial impairment to her lumbar spine of 10% according to current AMA Guidelines." (Tr. 300). Dr. Bash

emphasized in his treatment note that, "Permanent work restrictions of no lifting greater than 5 lbs. [Plaintiff] should avoid repetitive bending, lifting, twisting and torqueing of the lumbar spine." (Tr. 300).

   **b) Obesity**

   Between February 2008 and September 2009, plaintiff's weight fluctuated between 226 and 237 pounds, and her treating physicians generally observed her as obese or morbidly obese. (Tr. 217-20, 234 239-40). Plaintiff is approximately five (5) feet tall.[16] (Tr. 184, 248). In May 2009, plaintiff was encouraged by Dr. Josel to lose weight. (Tr. 219). Dr. Stevens also noted that plaintiff is one hundred (100) pounds overweight, and that her obesity "probably needs to be addressed by gastric banding." (Tr. 255).  In June 2009, Dr. Josel noted plaintiff's weight gain and placed her on a 1500 calorie diet "for weight loss". (Tr. 217). In late June 2009, Dr. Stevens gave plaintiff a referral to a surgeon who performs gastric bandings. (Tr. 252).  Plaintiff's endocrinologist, Dr. Oberstein, additionally noted that he would not recommend the use of diet pills, and plaintiff should find a way to exercise. (Tr. 241). Dr. Stevens noted in July 2009 that "[w]eight loss is

---

[16] One medical record indicates that plaintiff is 5'8" tall. (Tr. 258). Based on the Court's review of the record, this figure appears to be

a must." (Tr. 250) In November 2010, plaintiff was again
observed as obese. (Tr. 277-79).[17]

### c)    Asthma and Thyroid Issues

In January 2009, Dr. Josel provided plaintiff with a sample
of Advair discs. (Tr. 220). Plaintiff's records from St. Francis
Hospital, dated March 30, 2009, indicate that she was then
taking the medications Albuterol and Advair. (Tr. 214).  She
also reported a medical history of asthma. (Tr. 215). In May
2009, Dr. Stevens also noted that plaintiff has a history of
asthma. (Tr. 257).

Plaintiff has had Graves disease[18] (Tr. 215), and suffers
from postsurgical primary hypothyroidism. (Tr. 238, 240, 277-
79).  Plaintiff has had numbness in her hands "for years". (Tr.
238). She also suffers from heart palpitations. (Tr. 240).
Plaintiff had a goiter, and had a thyroid surgery in 1991. (Tr.
257).

---

an error.
[17] The record also indicates that plaintiff may be developing diabetes,
which plaintiff denied to her treating endocrinologist. (Tr. 238-39,
277-83).
[18] The Mayo Clinic defines Graves disease as an immune system disorder
that results in the overproduction of thyroid hormones.
http://www.mayoclinic.com/health/graves-disease/DS00181 (last visited
on January 8, 2013).

### d)   High Blood Pressure/Heart

From April 2009 through January 2011, plaintiff's blood pressure levels ranged from normal to slightly elevated.[19] (Tr. 217-219, 234, 238. 240, 286, 266, 290, 292).  In May 2009, plaintiff took Norvasc for her hypertension.  (Tr. 218).  X-rays dated March 3, 2008 and June 9, 2009, both revealed the presence of a cardiomegaly[20], without evidence of active chest disease. (Tr. 231, 227).

### e)   Polysystic Ovarian Syndrome

Plaintiff was diagnosed with endometritis in August 1999 (Tr. 232), and suffers from polycystic ovarian syndrome. (Tr. 238, 240). The May 22, 2009 MRI indicated the presence of a fibroid uterus (Tr. 228), which was confirmed by an ultrasound (Tr. 252).  In May 2009, plaintiff took birth control pills to control her cystic ovaries. (Tr. 257).  In April 2010, plaintiff told Dr. Bash that her uterine fibroid had been "scanned" and that it was "fine". (Tr. 271).  From June 2010 to January 2011, plaintiff was seen by Dr. Richard Driess for her fibroid uterus. (Tr. 284-98).  From July 2010 to approximately January 2011,

---

[19] See National Heart, Lung and Blood Institute website categorizing adult blood pressure levels. http://www.nhlbi.nih.gov/health/health-topics/topics/hbp/ (last visited on February 4, 2013).
[20] The Mayo Clinic defines cardiomegaly as an enlarged heart, which is not a disease, but a symptom of another condition. http://www.mayoclinic.com/health/enlarged-heart/ds01129 (last visited on January 8, 2013).

plaintiff received Lupron therapy[21] to treat this condition. (Tr. 284-93).  In January 2011, plaintiff was seen by Dr. Driess for a surgical consultation for a hysterectomy. (Tr. 284).

### f) Dr. Abraham Bernstein Disability Determination Explanation (Initial Level) dated November 23, 2009 (Tr. 52-59)

After reviewing medical records, Dr. Bernstein concluded that plaintiff suffers from several medically determinable impairments, including disorders of back – discogenic and degenerative; obesity, thyroid disorders, and essential hypertension. (Tr. 55).  Dr. Bernstein concluded that plaintiff's statements about intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the medical evidence. (Tr. 55). In his physical RFC assessment, Dr. Bernstein concluded that plaintiff had the following exertional limitations: could occasionally lift 20 pounds; frequently lift 10 pounds; stand, walk and sit for a total of 6 hours in an 8 hour workday; and  push and pull unlimited. (Tr. 56-57).  Dr. Bernstein also identified the following postural limitations: plaintiff could occasionally climb ramps and stairs, balance, stoop, and kneel; and could never climb ladders, ropes, and scaffolding, crouch, or crawl.

---

[21] Lupron is a man-made hormone that is used to, inter alia, reduce the amount of estrogen in women. http://www.drugs.com/lupron.html (lasted

(Tr. 56). No manipulative, visual or communicative limitations were identified. (Tr. 57). After an assessment of plaintiff's vocational factors, Amanda Martinez, Disability Adjudicator/Examiner, determined that plaintiff could return to her past work as a clerk[22] with a light RFC. (Tr. 57-58). Dr. Bernstein concurred with this assessment. (Tr. 58-59).

> **g)  Dr. Firooz Golkar Disability Determination Explanation (Reconsideration Level) dated January 21, 2010 (Tr. 61-69)**

After reviewing medical records on reconsideration[23], Dr. Golkar concluded that plaintiff suffers from several medically determinable impairments, including, disorders of back – discogenic and degenerative; obesity, and essential hypertension. (Tr. 64-65). Dr. Golkar likewise concluded that plaintiff's statements about intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the medical evidence. (Tr. 65). In his physical RFC assessment, Dr. Golkar concluded that plaintiff had the following exertional limitations: could occasionally lift 20 pounds; frequently lift 10 pounds; stand, walk and sit for a total of 6 hours in an 8 hour workday; and  push and pull

---

visited on January 15, 2013).
[22] Plaintiff worked as a "clerk" in the year 2000. (Tr. 57).
[23] The record indicates there was no reported change in plaintiff's condition at the time of the reconsideration analysis. (Tr. 64, 205).

unlimited. (Tr. 65-66).  Dr. Golkar also identified the
following postural limitations: plaintiff could occasionally
climb ramps and stairs, balance, stoop, and kneel; and could
never climb ladders, ropes, and scaffolding, crouch, or crawl.
(Tr. 66). No manipulative, visual or communicative limitations
were identified. (Tr. 66). Dr. Golkar indicated that plaintiff,
because of her asthma, should avoid concentrated exposure to
extreme cold and heat, fumes, odors, dusts, gases, poor
ventilation and hazards. (Tr. 67).  Dr. Golkar and Kevin Kyc, a
disability Adjudicator/Examiner, also concluded that plaintiff
was able to perform past work as a clerk. (Tr. 68-69).

**h)    Disability Reports (Tr. 164-66, 184-92)**

The field office disability report dated September 18,
2009, indicates that the interviewer observed plaintiff have
difficulty with sitting, standing, and walking. (Tr. 165).  The
interviewer also observed that plaintiff walked very slow, had
difficulty sitting and standing from a chair, was constantly
moving on her chair, and complained of pain. (Tr. 165).

Plaintiff completed an undated adult disability report.
(Tr. 184-192). Plaintiff is 5 feet tall and 232 pounds. (Tr.
184). In the report, plaintiff indicates her illnesses first
interfered with her ability to work in 1991. (Tr. 185).  As of

31

the date of this report, plaintiff was taking the following
medications: Flexeril, Ibuprofen, Lyrica, Methylprednisolone[24],
Naprosyn[25], Norvasc[26], Synthroid, and "yasman" (sic). (Tr. 190).
In an undated appeals disability report, plaintiff was taking
the following medications for her conditions: cyclobenzaprine;
Hydrocodone[27]; Ibuprofen; Lidoderm patch; Lyrica; Methocarbamol;
Naproxen; Norvasc; and Synthroid. (Tr. 208).

## VI.  DISCUSSION

Plaintiff makes a number of arguments to support reversal
of the Commissioner's final decision denying disability. For the
reasons that follow, the Court DENIES plaintiff's Motion to
Reverse, and GRANTS defendant's Motion to Affirm.

### A.    Step Three of Disability Analysis

Plaintiff argues that the ALJ erred at step three of the
disability analysis because his finding that her combination of
impairments did not meet listing 1.04 is not supported by the
evidence.  Plaintiff also argues that the ALJ failed to conduct

---

[24] Methylprednisolone is a steroid that prevents the release of
substances in the body that cause inflammation.
http://www.drugs.com/methylprednisolone.html (last visited January 8,
2013).
[25] Naprosyn is a nonsteroidal anti-inflammatory drug.
http://www.drugs.com/naprosyn.html (last visited January 8, 2013).
[26] Norvasc is a drug used to treat, inter alia, high blood pressure.
http://www.drugs.com/norvasc.html (last visited January 8, 2013).
[27] Hydrocodone is an opiate used for treatment of moderate to
moderately severe pain.  http://www.drugs.com/monograph/hydrocodone-
bitartrate.html (last visited on January 8, 2013).

a medical equivalence analysis.  The Commissioner counters that plaintiff failed to meet her burden of proving that she had an impairment or combination of impairments that met or equaled listing 1.04.

At step three of his analysis, the ALJ concluded that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. (Tr. 14).  The ALJ does not provide any analysis or rationale for this conclusion, but merely states, "In reaching this conclusion, I considered Listing 1.04 pertaining to disorders of the spine, but a review of the objective medical evidence revealed that it was not of a severity, which would satisfy the requirements of the listing." (Tr. 14).

Plaintiff bears the burden of showing that her impairments meet or equal Listing 1.04.  Dudley v. Sec. of Health and Human Serv., 816 F.2d 792, 793 (1st Cir. 1987).  In order to meet this burden, plaintiff must show that her medically determinable impairment satisfies all of the specified criteria in a Listing. See 20 C.F.R. §§ 404.1525(d), 416.925(d); see also Malloy v. Astrue, No. 3:10cv190(MRK)(WIG), 2010 WL 7865083, at *23 (D. Conn. Nov. 17, 2010) ("An impairment that manifests only some of those criteria, no matter how severe, does not qualify."). To

make this showing, the plaintiff must present medical findings equal in severity to all requirements which are supported by medically acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. § 416.926.

Listing 1.04 relates to disorders of the spine, herniated nucleus pulposus, spinal arachnoiditas, spinal stenosis, osteoarthritis or degenerative disc disease, that result in compromise of a nerve root or the spinal cord.  To meet the requirements of Listing 1.04, in addition to proving a spinal disorder resulting in compromise of a nerve root or spinal cord, a plaintiff must satisfy one of the following subsections of 1.04:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on

34

> appropriate medically acceptable imaging,
> manifested by chronic nonradicular pain and
> weakness, and resulting in inability to ambulate
> effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.04.[28]

The evidence of record does not support a finding that plaintiff meets Listing 1.04 and, accordingly, the Court finds the ALJ did not err in this regard.  In order to meet the requirements of this Listing, plaintiff must present evidence of a compromised nerve root or spinal cord.  As an initial matter, the evidence fails to establish plaintiff suffered from a compromised nerve root or spinal cord, which is a preliminary requirement of meeting Listing 1.04.  Indeed, early diagnostic images of plaintiff's back revealed mild diffuse annular bulge at the L4-5 level with mild central stenosis and degenerative changes of the facet joints (Tr. 228), mild scoliosis and mild degenerative changes involving the facets of the lower lumbar spine (Tr. 229),  and that her back was within normal limits. (Tr. 258).  Moreover, the most recent MRI of record does not indicate the presence of a herniated disc, but rather the

---

[28] Inability to ambulate effectively "means an extreme limitation of the ability to walk" and "is defined generally as having insufficient lower extremity functions to permit independent ambulation without the use of a hand-held assistive device(s) that limits the function of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.00B2b(1).  To ambulate effectively, one "must be capable of sustaining reasonable walking pace over a sufficient distance to be able to carry out activities of daily living."  Id. at § 1.00B2b(2).

presence of a broad-based disc bulge that has "potential to impinge the right-sided descending L5 nerve root." (emphasis added) (Tr. 261). Accordingly, although plaintiff's degenerative disc disease is considered a disorder of the spine, the diagnostic imaging fails to show that her condition resulted in "compromise of a nerve root or the spinal cord" as required by Listing 1.04. Plaintiff's failure to provide medically acceptable imaging evidence that she had impingement or compromise of a nerve root or spinal cord alone is sufficient to show that plaintiff's impairments did not meet or equal listing 1.04. Miller v. Astrue, No. 2:09-cv-650-FTM-DNF, 2011 WL 1598731, at *6 (M.D. Fla. April 28, 2011) (where plaintiff's diagnostic imagining "merely showed post-surgical changes with forward displacement of L5 over s1 and other minor abnormalities such as mild or moderate disc space loss at L5, granulation tissue with residual fibrosis suspected, some degenerative changes, and minimal sclerotic changes", plaintiff failed to present evidence of compromise of a nerve root or the spinal cord).

A further review of the evidence indicates that plaintiff otherwise fails to meet the requirements of Listing 1.04(A),(B), or (C). Listing 1.04(A) requires the plaintiff to produce

"Evidence of a nerve root compression characterized by [1] neuro-anatomic distribution of pain, [2] limitation of motion of the spine, [3] motor loss (atrophy with associated muscle weakness or muscle weakness) [4] accompanied by sensory or reflex loss and, [5] if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." First, there is no evidence that plaintiff's back impairment resulted in motor loss.  In fact, plaintiff repeatedly had full motor strength in her legs upon examination. (Tr. 245, 258, 267-68, 271, 304).  Although the record indicates that plaintiff had positive straight leg tests, the record fails to establish that the positive straight leg raising was in both the seated and supine positions. (Tr. 221, 245, 258, 267, 271, 303).  For these reasons, plaintiff has failed to meet her burden of showing that her back impairment meets Listing 1.04(A).  See Laveck v. Astrue, No. 5:10-CV-1355 (RFT), 2012 WL 4491110, at *4 (N.D.N.Y. Sept. 28, 2012) (finding plaintiff failed to meet her burden that her back impairment meets Listing 1.04(A) where she failed to present evidence of motor loss accompanied by sensory reflect loss and positive straight leg raise tests in both the seated and supine positions); see also Kimbrough v. Astrue, No. 3:10CV-00751-H, 2011 WL 4473094, at *4 (W.D. Ky. June 13, 2011)

37

(quoting Charles T. Hall, Social Security Disability Practice: A Lawyer's Prospective, commentary on Listing 1.04) ("Part A of this Listing [1.04] is virtually impossible to meet.  It is a laundry list of almost all signs of an acute low back problem that might require immediate hospitalization and surgery.  It is not a description of many people suffering from chronic low back pain.").

Plaintiff likewise fails to meet her burden with respect to Listing 1.04(B), as the record does not establish the presence or diagnosis of spinal arachnoiditis.  Finally, the evidence fails to establish all of the required elements of Listing 1.04(C), which requires, inter alia, "chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b."  As set forth above, plaintiff consistently presented with full motor strength in her legs. (Tr. 245, 258, 267-68, 271, 304).  Additionally, although plaintiff used a cane to walk at the time of the hearing before the ALJ, there is no evidence that she is unable to ambulate effectively, as that term is defined in 1.00B2b.  See note 28, supra; see also Serrano, 2011 WL 1399465, at *8 ("The use of a cane does not meet the regulation's definition of an inability to ambulate ineffectively because the use of a cane impacts the

38

functioning of one hand/arm only."). Accordingly, the Court finds that the ALJ did not err in finding plaintiff failed to meet Listing 1.04.

Plaintiff also asserts that the ALJ failed in performing a medical equivalence analysis because he failed to consider the limitations caused by pain or the effects of plaintiff's extreme obesity on her back injury. Again, plaintiff's arguments are misplaced. At step three, the ALJ explicitly states that plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments […]" (Tr. 14). See Francis v. Astrue, No. 3:09-CV-1826(VLB)(TPS), 2010 WL 3432839, at *4 (D. Conn. Aug. 30, 2010) (ALJ's statement that she had considered claimant's impairments in combination demonstrated that the ALJ had considered obesity in combination with other impairments). Previously in his decision, the ALJ specifically addressed plaintiff's obesity, and in fact considered it a severe impairment. (Tr. 14). Later, the ALJ also stated that he "considered all symptoms" (Tr. 14), considered "the impact from obesity and the chronic pain syndrome" (Tr. 16), and that the "overall impact [of plaintiff's obesity] on all symptom/impairments was considered". (Tr. 16). Even considering the medical equivalence argument, plaintiff has

failed to meet her burden in presenting how her combination of impairments meets the requirements of Listing 1.04.

Plaintiff finally argues that the ALJ's analysis at step three is deficient because he offers no explanation as to why plaintiff does not meet the Listing.  The Second Circuit has found, however, that absence of an express rationale does not prevent a court from upholding an ALJ's determination, where other portions of the ALJ's decision, and the evidence before him, indicate his conclusion was supported by substantial evidence.  Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982); see also Salmini v. Comm'r of Social Sec., 371 F. App'x 109, 112 (2d Cir. 2010) (quoting Berry, 675 F.2d at 469)("Although we have cautioned that an ALJ 'should set forth a sufficient rationale in support of his decision to find or not find a listed impairment,' the absence of an express rationale for an ALJ's conclusion does not prevent us from upholding them so long as we are 'able to look to other portions of the ALJ's decisions and to clearly credible evidence in finding that his determination was supported by substantial evidence.'"). Here, although the ALJ could have been more specific in detailing the reasons why plaintiff's condition or combination of impairments did not satisfy a listed impairment, other portions of the ALJ's

40

decision, along with the evidence of record before the Court, demonstrate that substantial evidence supports this part of the ALJ's findings.  "Accordingly, because this is not a case in which we would be unable to fathom the ALJ's rationale in relation to evidence in the record, there is no need for us to remand this case to the ALJ for clarification." Salmini, 371 F. App'x at 113 (internal citation and quotation omitted).

For these reasons, the Court finds that there is substantial evidence in the record to support the ALJ's finding that plaintiff's impairments, or combination of impairments, do not meet a Listing.

### B.  *Treating Physician Rule*

Plaintiff next argues that the ALJ failed to give controlling weight to the "treating sources statements", and erred as a matter of law in his application of this rule.

Under the "treating physician rule," the ALJ is required either to give the opinion of a treating physician controlling weight, or to explain the reasons for discounting that opinion. 20 C.F.R. §404.1527(c)(2); see Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010).  An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give

41

to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. Id. The regulations also specify that the Commissioner "will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion." Id.; see also Schaal v. Apfel, 134 F.3d 496, 503-04 (2d. Cir. 1998) (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion). Nevertheless, where "the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." Petrie v. Astrue, 412 F. App'x 401 (2d Cir. 2011) (citing Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983)).  Moreover, the only opinions that are entitled

42

to controlling weight under this rule, are medical opinions from treating sources that are (1) well supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) not inconsistent with other substantial record evidence. 20 C.F.R. § 404.1527(c)(2).  See also Snell v Apfel, 177 F.3d 128, 133 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir 1999).

Here, the ALJ did not violate the treating physician rule by failing to give controlling weight to the opinion of Dr. Bash.  The opinion of a treating source will not be afforded controlling weight if that opinion is not consistent with other substantial evidence in the record, including the opinions of other medical experts.  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527, 416.927.  Substantial evidence supports the finding that Dr. Bash's opinion was not entitled to controlling weight. As the ALJ noted in his decision, Dr. Bash's opinion is not consistent with other substantial evidence in the record. (Tr. 16).  For example, Dr. Bash's opinion limited plaintiff to lifting up to five (5) pounds. (Tr. 300).  This is not consistent with the opinion of Dr. Stevens that limited plaintiff to lifting twenty (20) pounds while wearing a lumbar

corset. (Tr. 248).   Nor is it consistent with the opinions of Drs. Bernstein and Golkar, who found plaintiff could occasionally lift twenty (20) pounds, and frequently lift ten (10) pounds. (Tr. 56, 66).   Despite not providing Dr. Bash's opinion controlling weight, the ALJ nonetheless did afford his opinion "greater weight" than that of Dr. Stevens and the State agency medical consultants.   In fact, Dr. Bash's limitations regarding lifting and bending fall within the parameters of sedentary work. (Tr. 300); see note 2, supra.   To the extent the ALJ may have considered plaintiff's conservative treatment, or internal conflicts in Dr. Bash's opinions, when deciding the weight to give to his opinions, the Court finds that any such consideration constitutes harmless error in light of the conflicts between Dr. Bash's opinions and that of other medical sources.   As such, the Court finds the ALJ did not err in failing to provide controlling weight to Dr. Bash's opinion.

Contrary to plaintiff's contention, the ALJ did not "substitute[] his opinion for every doctor in the file" when making the RFC determination.   "Genuine conflicts in the medical evidence are for the Commissioner to resolve."   Veino, 312 F.2d at 588 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). Accordingly, to the extent that the medical evidence was in

conflict with respect to plaintiff's RFC and functional limitations, the ALJ was entitled to resolve such conflicts. Although the Court agrees that an ALJ may not arbitrarily substitute his own judgment for competent medical opinion, here the ALJ had evidence before him to support his RFC determination.  But c.f. McBrayer v. Sec. Health and Human Serv., 712 F.2d 795, 799 (2d Cir. 1983) (citations omitted) (where a doctor's report "stands unchallenged except by the ALJ's own inference to the contrary", "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion").

Finally, the plaintiff argues that the ALJ had an obligation to "recontact Dr. Bash and ask him to reconcile the 10% permanency rating with the inability to bend or torque one's spine and lift less than 5 lbs. (sic)".  The Court agrees with the Commissioner that, "because the record evidence was adequate to permit the ALJ to make a disability determination", there is no merit in plaintiff's claim that the ALJ was obligated to recontact Dr. Bash.  Carvey v. Astrue, 380 F. App'x 50, 53 (2d Cir. 2010) (citing Perez, 77 F.3d at 47-48; 20 C.F.R. § 404.1512(e)).  As such, the Court finds the ALJ did not violate the treating physician rule.

45

### C.   Failure to Incorporate All Limitations in RFC

Plaintiff "bears the burden of proof as to the first four steps [of the disability determination]", Berry, 675 F.2d at 467, which necessarily includes the burden of establishing her RFC. Diaz v. Shalala, 59 F.3d 307, 312 n.2 (2d Cir. 1995). Plaintiff argues that the ALJ erred in failing to incorporate limitations reasonably attributable to all of her medically verifiable impairments, including obesity, hypertension, hypothyroidism, cervical fibroid, asthma, and arthritis, into the RFC determination that plaintiff was capable of sedentary work, with limitations.  The Court rejects plaintiff's argument. As an initial matter, the ALJ, at step four, specifically states that, in making a finding as to plaintiff's RFC and "[a]fter careful consideration of the entire record", he "considered all symptoms and the extent to which these symptoms can reasonably be expected as consistent with the objective medical evidence and other evidence[…]." (Tr. 14).  It is apparent from the face of the ALJ's decision that his review of the medical evidence of record was not limited solely to the impairments he found severe. (Tr. 13-18).

Plaintiff's next argument that the ALJ failed to attribute any limitations to her pain and obesity are likewise misplaced.

As set forth above, the ALJ expressly stated that he considered "all symptoms". (Tr. 14). Moreover, it is apparent from the ALJ's decision that he did in fact consider plaintiff's pain and obesity. (Tr. 14-18). For example, at step four, the ALJ states that, "even considering the impact from obesity and the chronic pain syndrome, the overall evidence as assessed does not further limit the residual functional capacity. The [plaintiff] does not specifically allege limitations secondary to her obesity, but its overall impact on all symptom/impairments was considered." (emphasis added) (Tr. 16). See Francis, 2010 WL 3432839, at *4, supra. Moreover, and as plaintiff states, the medical record is replete with references to plaintiff's obesity. The ALJ relied on such records in his RFC determination, and accordingly implicitly factored plaintiff's obesity into his RFC determination. Drake v. Astrue, 443 F. App'x 653, 657 (2d Cir. 2011) ("agree[ing] with the District Court that the ALJ implicitly factored [plaintiff's] obesity into his RFC determination by relying on medical reports that repeatedly noted [plaintiff's] obesity and provided an overall assessment of her work-related limitations."). Finally, although plaintiff had an "extreme", category III obesity, "[t]hese levels describe the extent of obesity, but they do not correlate with any

47

specific degree of functional loss." SSR 02-1p, 2002 WL
34686281, at *2 (S.S.A. Sept. 12, 2002). Simply put, plaintiff
has failed to carry her burden that her obesity or her pain
limited her RFC in any way greater than that found by the ALJ.

Plaintiff next argues that the ALJ erred by failing to
consider limitations caused by plaintiff's pain medication in
his RFC determination. Plaintiff testified that she is "on
medication" and that "[a]ll day [she] sleep[s] a lot." (Tr. 38).
In making his RFC determination, the ALJ considered this side-
effect of plaintiff's medication and stated that, "she did not
mention it or report any other side effects to her treating
sources." (Tr. 16).  The Commissioner and the ALJ are incorrect
that plaintiff's medical records do not document complaints
about side-effects of her pain medications. However, a review of
the record only reveals one complaint made.  In June 2009, Dr.
Stevens reported that plaintiff did not tolerate Darvocet or
tramadol, which made her nauseated. (Tr. 254).  Nevertheless,
there is also indication in the record that plaintiff was not
taking her medications correctly. (Tr. 250).  Moreover, in
plaintiff's undated Disability Report, she fails to report any
side-effects to the medications she was then taking (Tr. 190),
but at the appeals level, plaintiff's disability report

indicates that "not certain which med (sic) causes each symptom, so when taking all meds as prescribed she gets: blurry vision[,] drowsiness[,] slurred speech[,] loss of memory." (Tr. 208). These alleged side-effects are not consistent with, or supported by, the medical record.  Indeed, only one complaint was registered by plaintiff with respect to her medication, and there is no evidence in the medical record that the alleged side-effects imposed limitations upon her greater than that found by the ALJ. See, e.g., Brockway v. Barnhart, 94 F. App'x 25, 28-29 (2d Cir. 2004) (rejecting plaintiff's claim that the ALJ ignored side effects of medications in assessing RFC where the medical reports did not reflect any complaints by plaintiff about side effects of the medications, and where plaintiff's application for DIB failed to assert that plaintiff suffered from medication side-effects).

The Court likewise rejects plaintiff's argument that the ALJ erred by failing to incorporate any limitations for asthma in his RFC determination.  The ALJ found that plaintiff's alleged asthma was non-severe and "did not cause any functional limitations or that any limitations were minimal at best." (Tr. 14).  A review of the medical evidence supports this conclusion. Indeed, although the medical evidence indicates that plaintiff

49

has a history of asthma (Tr. 215, 257) and was taking medication for it (Tr. 220, 257), there is no evidence that her asthma imposed any functional limitations upon her.  Indeed, Dr. Bernstein did not ascribe any environmental limitations on account of plaintiff's asthma (Tr. 55), and noted that the medical evidence of record "does not support allegations of asthma." (Tr. 57).  Although Dr. Golkar ascribed various environmental limitations to plaintiff's asthma (Tr. 67), he also noted that the medical evidence of record "does not support allegations of asthma." (Tr. 65). The Court agrees that the medical evidence of record does not support allegations of asthma causing functional impairment, nor does it support Dr. Golkar's findings of environmental limitations.  Accordingly, the ALJ did not err in failing to attribute limitations to plaintiff's asthma.

With respect to plaintiff's alleged hypertension, hypothyroidism, arthritis, and uterine fibroids, the Court likewise finds that the medical evidence of record does not support a finding of additional limitations on this basis.  With respect to plaintiff's hypertension and "cardiac condition", there is no evidence that these conditions, which the ALJ found non-severe, impose any limitations.   There is also no evidence

that plaintiff's polycystic ovarian syndrome imposes any limitations.  Although plaintiff suffers from hypothyroidism and, as a consequence, heart palpitations (Tr. 240) and numbness in her hands (Tr. 240), the ALJ determined that plaintiff's thyroid disorder "did not cause any functional limitations or that any limitations were minimal at best." (Tr. 14).  Again, the medical evidence of record does not support a finding of such limitations. Indeed, both Drs. Golkar and Abraham found that plaintiff does not suffer from manipulative limitations. (Tr. 56, 66).  There is also no evidence that plaintiff's heart palpitations impose restrictions.  As to plaintiff's alleged arthritis, the Court agrees with the Commissioner that the only evidence of arthritis is plaintiff's self-report of the results of an x-ray taken in March 2009. (Tr. 257).  Subsequent diagnostic reports, and indeed medical records in general, fail to mention the presence of arthritis in plaintiff's back. Accordingly, the Court finds that substantial evidence in the record supports the ALJ's RFC determination.

### D.   *Plaintiff's Credibility*

The plaintiff argues that the ALJ erred in his credibility assessment because he did not provide evidentiary support for his credibility finding. The ALJ is required to

assess the credibility of the plaintiff's subjective complaints.
20 C.F.R. §416.929.  The courts of the Second Circuit follow a
two-step process. The ALJ must first determine whether the
record demonstrates that the plaintiff possesses a medically
determinable impairment that could reasonably produce the
alleged symptoms.  20 C.F.R. §416.929(a) ("[S]tatements about
your pain or other symptoms will not alone establish that you
are disabled; there must be medical signs and laboratory
findings which show that you have a medical impairment(s) which
could reasonably be expected to produce the pain or other
symptoms alleged and which, when considered with all of the
other evidence (including statements about the intensity and
persistence of your pain or other symptoms which may reasonably
be accepted as consistent with the medical signs and laboratory
findings), would lead to a conclusion that you are disabled.").
Second, the ALJ must assess the credibility of the plaintiff's
complaints regarding the intensity of the symptoms. Here, the
ALJ must first determine if objective evidence alone supports
the claimant's complaints; if not, the ALJ must consider other
factors laid out at 20 C.F.R. §416.929(c). See, e.g., Skillman
v. Astrue, No. 08-CV-6481, 2010 WL 2541279, at *6 (W.D.N.Y. June
18, 2010).   These factors include activities of daily living,

medications and the plaintiff's response thereto, treatment other than medication and its efficacy, and other relevant factors concerning limitations.  20 C.F.R. §416.929(c)(3).  The ALJ must consider all the evidence in the case record.  SSR 96-7p 1996 WL 374186, at *5.  Furthermore, the credibility finding "must contain specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. This District has held that the "ALJ's assessment of [a] claimant's credibility deserves great deference, but is always subject to whether the assessment is based on substantial evidence." Burrows v. Barnhart, No. 3:03CV342(CFD)(TPS), 2007 WL 708627, at *11 (D. Conn. Feb. 20, 2007).

Plaintiff first argues that the ALJ's credibility determination "evades review" because his decision only contains boilerplate.  The Court disagrees.  Here, the ALJ reviewed the medical evidence in detail and determined that the objective medical findings did not support plaintiff's alleged symptoms and disabling pain. (Tr. 13-17).  In addition to treatment records and plaintiff's testimony, he considered the opinions of

the State agency consultants; considered plaintiff's daughter's testimony; reviewed the diagnostic imaging reports; and considered plaintiff's treatment history, including her medication and its side-effects. (Tr. 13-17).

Plaintiff next argues that the ALJ erred to the extent that he "put the cart before the horse" in finding that plaintiff's allegations regarding the severity of her symptoms and limitations were not credible to the extent alleged because "they are inconsistent with the above residual functional capacity assessment." (Tr. 16).  Specifically, plaintiff states that the ALJ was required to listen to plaintiff's testimony and make a credibility determination before he propounded the RFC. Plaintiff appears to support this argument on the format of the ALJ's decision.  Again, the Court fails to find any evidence in the record to support this argument.  In his decision, the ALJ states that he made his findings of fact "[a]fter careful consideration of the entire record." (Tr. 12).  The ALJ reiterated this point at step four of the analysis, i.e. the RFC determination, and stated that he made such a determination "[a]fter careful consideration of the entire record." (Tr. 14). The Court finds the case of Amaral v. Comm'r Soc. Sec., 797 F. Supp. 2d 154, 161 (D. Mass 2010) instructive on this point.

There, faced with a similar "circular reasoning" argument, the district court noted that,

> At first glance, the contention appears to hold weight, but a review of the remainder of the [hearing officer's] residual functional capacity analysis indicates that the [hearing officer] did weigh [the claimant's] testimony prior to reaching his conclusion. He did not discredit [the claimant's] testimony <u>because</u> it was inconsistent with his residual functional capacity assessment. Rather, he explained that he was rejecting it <u>to the extent</u> it was inconsistent with his assessment and then went on to explain <u>why</u> he was rejecting it.

<u>Id.</u> (quoting <u>Davidson v. Astrue</u>, No. CV10-0012-PHX-NVW, 2010 WL 5252838, at *9 (D. Ariz. Dec. 10, 2010)) (emphasis in original). Here, the ALJ likewise weighed the plaintiff's testimony prior to making an RFC determination.  The ALJ's decision rejects plaintiff's testimony to the extent it was inconsistent with his assessment and then went on to explain why he was rejecting it. As such, the Court finds that the ALJ did not err in this regard.

Additionally, despite plaintiff's arguments to the contrary, the ALJ specifically discounted plaintiff's, and her daughter's, testimony regarding the level of plaintiff's functional capacity. (Tr. 16).  The ALJ specifically stated that, "The level of function testified to by the claimant and her daughter was not supported by the medical evidence of

record[…]" (Tr. 16).   Prior to setting forth this conclusion,
the ALJ summarized the pertinent testimony of plaintiff and her
daughter that related to plaintiff's functional capacity. (Tr.
15). The ALJ also discounted plaintiff's testimony concerning
the side-effects of her medication when he stated that,
"Although the [plaintiff] testified that her pain medications
had side effects of making her sleepy, she did not mention it or
report any other side effect to her treating sources." (Tr. 16).
The ALJ moreover found that, "In terms of the [plaintiff's]
alleged degenerative disc disease with associated chronic pain
radiating into both legs, the record reflected that she has not
generally received the type of medical treatment one would
expect for a totally disabled individual." (Tr. 16).  It is also
noted that Dr. Stevens treated plaintiff conservatively for her
back injuries. (Tr. 16).  The ALJ further took into
consideration Dr. Bash's opinion that plaintiff "was not a
surgical candidate, but [] thought that the back impairment
might require additional conservative treatment at some point in
the future." (Tr. 16).  Although plaintiff argues that "the ALJ
is not competent to decide that [plaintiff] was receiving the
proper treatment", "[e]vidence of 'conservative treatment' is
sufficient to discount a claimant's testimony regarding severity

56

of impairment." <u>Parra v. Astrue</u>, 481 F.3d 742, 751 (9th Cir. 2007) (citing <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1424 (9th Cir. 1995)); <u>see also</u> 20 C.F.R. § 404.1529(c)(3)(v) (treatment other than medication is one factor to be considered when assessing a claimant's subjective allegations). As such, the Court rejects plaintiff's argument that the ALJ failed to make a sufficiently detailed finding on the issue of credibility.

The plaintiff next argues that the ALJ failed to satisfy his duty to develop the record with respect to plaintiff's treatment. Although the ALJ may have a duty to develop the record where there is a gap in the record, <u>see Rosa</u>, 168 F.3d at 79, no such duty exists where there is no gap.[29] The Court is satisfied that the ALJ sufficiently developed the record. At the hearing, the ALJ inquired whether Social Security Administration ("SSA") had all of plaintiff's records (Tr. 22); advised plaintiff that SSA needed updated reports from Dr. Bash (Tr. 38-39); advised plaintiff of the last items in her file as of the date of the hearing (Tr. 38); inquired whether plaintiff's records from Dr. Overstein were up to date (Tr. 39-40); provided plaintiff with forms and releases for the missing medical records to be provided to SSA (Tr. 40, 48-49); inquired

---

[29] There is, however, a heightened duty to develop the record where a claimant proceeds <u>pro</u> <u>se</u>. <u>Moran v. Astrue</u>, 569 F.3d

if plaintiff had any MRIs since May 2010 (Tr. 40); and left the record open for two weeks following the hearing so that he could obtain the additional medical records. (Tr. 49).  Accordingly, the ALJ did not fail in developing the record.

Finally, plaintiff argues that her statements regarding the degree of pain and the limitations caused by her impairments should be deemed credible because of her "prior work record and efforts to work." See Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983).  However, this is just one of many factors that the ALJ should consider and it does not mean that the ALJ must find the claimant's allegations credible if the medical record does not support a finding of disability.  See Diaz v. Astrue, No. 3:11CV00317(VLB)(TPS), 2012 WL 3903388, at *7 (D. Conn. Aug. 2, 2012); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  The ALJ's failure to consider this one factor in his credibility assessment does not require a reversal. See Malloy v. Astrue, No.3:10cv190(MRK)(WIG), 2010 WL 7865083, at *29 (D. Conn. Nov. 17, 2010).  Moreover, the ALJ did not ignore plaintiff's work history.  He specifically addressed it in concluding that plaintiff was not able to perform her past relevant work. (Tr. 17).  See Wavercak v. Astrue, 420 F. App'x 91, 94 (2d Cir.

---

108, 113 (2d Cir. 2009).

2011).  Accordingly, the Court finds that the ALJ's credibility assessment is supported by substantial evidence.

### E.    *Step Five of Disability Analysis*

Plaintiff further argues that the ALJ did not meet his burden of proof at step five of the disability analysis because he relied upon a defective RFC and on vocational expert ("VE") testimony that was inconsistent with the Dictionary of Occupational Titles ("DOT").  The Court has already considered and rejected plaintiff's argument that the ALJ's RFC is defective.  See Section VI(C), supra.  Accordingly, plaintiff's argument that the Commissioner did not meet his burden of proof at step five of the disability analysis because he relied upon a defective RFC must fail.

At the administrative hearing, the ALJ presented a series of hypotheticals to the VE.  The ALJ first inquired whether an individual of plaintiff's same age, vocational profile and educational level, who could work at the light exertional level, with occasional climbing of ramps and stairs, no climbing of ropes and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl, would be able to perform plaintiff's past relevant work as a home companion or nurses aide. (Tr. 45).  The VE responded, no. (Tr. 45)  The ALJ then asked whether such an

individual could perform other jobs at the light exertional
level. (Tr. 45).  The VE identified three representative
occupations that such an individual could perform, hand packer,
production worker, and production inspector. (Tr. 45).  At the
hearing, the VE identified representative DOT numbers for these
occupations as 920.687-166, 726.687-042, and 733.687-062,
respectively. (Tr. 46).  The ALJ inquired whether these jobs
would be available with an added requirement that the person be
able to sit and stand at will. (Tr. 45-46).  The VE responded
that these jobs would still be available, but in lesser number.
(Tr. 46).  The ALJ next inquired whether these same jobs would
be available, if the individual would only be able to stand
and/or walk two hours out of an eight hour work day. (Tr. 46).
Again, the ALJ responded that all of these jobs would be
available, but reduced in number by fifty percent. (Tr. 46-47).
Finally, the ALJ reduced the person's overall capability to
sedentary, with the additional limitations provided, and the VE
testified that the same jobs would be available, but further
reduced in number. (Tr. 47).  The VE further testified that his
testimony was consistent with the DOT. (Tr. 47).

Plaintiff raises issue with the fact that the VE listed job
categories, as opposed to specific jobs, and offered DOT numbers

that did not match the jobs listed in the ALJ's decision. At the
hearing, the VE testified to the representative occupations of
hand packer, production worker, and production inspector.  What
the plaintiff fails to address is the fact that the VE then
identified "representative DOT" numbers for these positions.
(Tr. 46) (emphasis added).  For a hand packer, the VE identified
DOT 920.687-166, a shoe packer.  For production workers, he
identified DOT 726.687-042, a sealer, semiconductor packages.
For production inspector, he identified DOT 733.687-062, a
pencil inspector. (Tr. 46).  Accordingly, the court finds
unavailing plaintiff's argument that the ALJ erroneously relied
on VE testimony that failed to identify specific jobs, where the
VE identified DOT numbers for specific jobs of the
representative occupations discussed.  The Court likewise finds
unavailing plaintiff's argument that the VE offered DOT numbers
that did not match representative occupations listed in the
ALJ's decision.  In his decision, the ALJ lists the
representative occupations as hand packer, production worker,
and production inspector. (Tr. 18).  The ALJ also identifies the
DOT numbers testified to by the VE, except for that of hand
packer, which the ALJ lists as "920.687.066".  The Court agrees
with the Commissioner that this is a mere scrivener's error and

constitutes harmless error.

Plaintiff argues that the ALJ improperly relied on the VE's testimony that plaintiff could perform the above-referenced jobs (i.e., shoe packer, sealer, semiconductor packages, and pencil inspector) at the sedentary level, because these jobs are classified in the DOT as requiring light levels of exertion. The case of Bellamy v. Apfel, 110 F. Supp. 2d 81, 92 (D. Conn. 2000), is instructive.  There, like the testimony now at issue, the VE testified to certain jobs.  The VE limited his testimony concerning the number of jobs available to those that met the functional limitations imposed by the ALJ's hypothetical.  The VE did not testify that plaintiff could perform all of the jobs identified but, rather, his estimates were restricted to the limitations set forth in the hypothetical.  When the ALJ amended his hypothetical to encompass only those meeting the sedentary exertional level, including functional limitations used in previous hypotheticals, the number of jobs decreased dramatically. Bellamy, 110 F. Supp. 2d at 92.  Here, as in Bellamy, "the expert was asked specifically for the number of jobs available given plaintiff's physical limitations." Id.   As the Bellamy Court noted,

> "The Regulations simply provide that this [DOT job categories] is one of several sources that the ALJ may take administrative notice of in determining whether

> unskilled, sedentary, light, and medium jobs exist in the national economy and in significant numbers in the country. 20 C.F.R. § 404.1566(d).  The Regulations also allow for the use of a VE, 20 C.F.R. § 404.1566(e), but do not require the VE to base his or her testimony on the DOT listing.  In Powers v. Apfel, 207 F.3d 431, 436 (7th Cir. 2000), the Court held that even if a vocational expert's testimony is contradicted by DOT descriptions, a hearing officer is entitled to rely on expert testimony that contradicts such authorities.

Id.

Accordingly, for the plaintiff "to argue that the jobs to which [the VE] testified did not meet plaintiff's physical limitations ignores the express limitations clearly set forth in the ALJ's hypothetical questions." Id.  Accordingly, like the Court in Bellamy, "[w]e find no error in the ALJ's relying on this expert testimony in support of his determination at step 5 that there were significant number of jobs in the national and local economy that plaintiff could perform given her RFC, age, education, and past work experience." Id.

Plaintiff next asserts that the ALJ was required to inquire of plaintiff as to her understanding of the VE's testimony. Following the VE's testimony, the ALJ asked plaintiff whether, on the basis of the VE's testimony, there was anything she wanted to ask him or the VE. (Tr. 47).  Plaintiff responded that she "really did not understand it." (Tr. 48).  The ALJ then

63

explained the VE's testimony, stating that

> The doctor is basically testifying from his experience
> in terms of placing people in jobs and the knowledge
> of the job market based on a publication that is
> called the Dictionary of Occupational Titles, which
> basically lists all types of jobs.  The doctor has
> assessed, based on the limitations that I have given
> what a person with those limitations could perform
> according to his experience and the jobs that are
> listed in the DOT. (Tr. 48).

Plaintiff did not inquire further of the VE's testimony.  The
ALJ, however, provided the plaintiff with another opportunity to
ask him questions before he closed the hearing. (Tr. 49).
Plaintiff stated that, "it seems like I said enough." (Tr. 49).
Moreover, the ALJ was not required at this stage of the hearing
to again ask plaintiff whether she wished to proceed without an
attorney.  As previously discussed, the ALJ canvassed plaintiff
about proceeding pro se, and on three separate occasions
inquired whether she wished to proceed with an attorney. (Tr.
21-22, 24-26).  Plaintiff additionally executed a written waiver
of right to representation.(Tr. 26, 128).

Plaintiff finally argues that there is nothing in the
record that would qualify the VE as an expert because he did not
testify as to his experience or qualifications, and because his
resume does not indicate that he had any formal or informal
training in performing vocational assessments.  Plaintiff fails

64

to provide any authority in support of this position.  A review
of the administrative transcript reveals that the VE did not
testify about his training, background, knowledge or experience
in performing vocational assessments. At the hearing, the VE
testified without objection by plaintiff. (Tr. 44).  The ALJ
furthermore afforded plaintiff an opportunity to question the
VE, after he had answered the ALJ's hypothetical questions. (Tr.
47-48). "Instead of objecting during the administrative hearing,
plaintiff now raises the issue of the VE's qualifications for
the first time without allowing the ALJ the opportunity to
inquire into the VE's knowledge and experience.  Plaintiff's
failure to raise this issue before the ALJ effectively waived
any challenge to the VE's qualifications, particularly in light
of the opportunity [s]he was given to question the VE after []he
had finished answering the ALJ's hypothetical questions."[30]
Haskins v. Comm'r of Soc. Sec., No. 5:05-CV-292, 2008 WL
5113781, at *16 (N.D.N.Y. Sept. 11, 2008); see also Carvey v.
Astrue, No. 06-CV-0737, 2009 WL 3199215, at *14 (N.D.N.Y. Sept.
30, 2009) (internal citations omitted) ("The failure to present
an argument to the ALJ constitutes waiver of the right to raise

---

[30] The Court recognizes that plaintiff proceeded pro se at the
administrative hearing.  However, plaintiff effectively waived her
right to proceed with counsel despite the benefits it could have
afforded her, such as objecting to the vocational expert.

it on appeal.  Raising a discrepancy only after a hearing, is too late.").  Notwithstanding the waiver argument, the Court has reviewed the VE's resume, which is part of the record (Tr. 121-123), and finds the VE was qualified to testify as an expert. Moreover, Dr. Steven Sachs has served as a vocational expert for the Social Security Administration, Office of Adjudication and Review, from August 1995 to the present date. (Tr. 122).  See also Burgos v. Astrue, No. 3:09-cv-1216(VLB), 2010 WL 3829108, at *7 (D. Conn. Sept. 22, 2010) (Dr. Steven Sachs testified as vocational expert); Francil v. Astrue, No. 3:09-CV-1826(VLB)(TPS), 2010 WL 3432839, at *5 (D. Conn. Aug. 30, 2010) (same).  As such, plaintiff's argument that the VE is not qualified as an expert is likewise without merit.

As such, and based on the foregoing, the Court finds that the ALJ did not err at step five of the disability analysis, and that his findings are supported by substantial evidence.

**VII.      CONCLUSION**

For the reasons stated, plaintiff's Motion to Reverse **[Doc. # 18]** is **DENIED** and the Commissioner's Motion to Affirm **[Doc. # 24]**is **GRANTED.**  This is a Recommended Ruling. See Fed. R. Civ. P. 72(b)(1).

Any objections to this recommended ruling must be filed

with the Clerk of the Court within fourteen (14) days of being served with the order.  See Fed. R. Civ. P. 72(b)(2).  Failure to object within fourteen days may preclude appellate review. See 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b); and D. Conn. L. Civ. R. 72.2; Small v. Secretary of H.H.S., 892 F.2d 15 (2d Cir. 1989)(per curiam); F.D.I.C. v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995).

Dated at Bridgeport, this 26th day of March 2013.

/s/
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE